COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-418-CV

DOLORES ZARNOW, AS APPELLANT

ADMINISTRATOR OF THE ESTATE

OF ALLEN ZARNOW, M.D., DECEASED 

V.

CLINICS OF NORTH TEXAS APPELLEE

------------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In seven issues, Appellant Dolores Zarnow (“Dolores”), as Administrator of the Estate of Allen Zarnow, M.D., Deceased (“Dr. Zarnow”) asserts that the trial court erred by granting the motions for summary judgment of Appellee Clinics of North Texas (“the Clinic”). 

II.  Factual and Procedural Background

A.  Dr. Zarnow and the Clinic 

Dr. Zarnow was a partner and a physician-employee of the Clinic from the fall of 1995 until his termination in July 1999.  The Clinic operated medical facilities at various locations in Wichita Falls; Dr. Zarnow practiced rheumatology at the Tenth Street location.

Because of the nature of his specialty, Dr. Zarnow routinely required diagnostic studies and lab services, such as blood tests and liver function tests, in the treatment of his patients.  According to Dr. Zarnow, the Clinic’s policies required diagnostic studies and lab work for Clinic patients to be done at the Clinic facilities by Clinic employees.  On numerous occasions, however, Dr. Zarnow referred patient lab work to laboratories outside the Clinic because of what he considered to be slow turnaround times and inaccuracies in their studies.  He chronically complained about this problem to Clinic executives.  However, according to the Clinic, no Clinic policy required in-house diagnostic studies and lab work, but the Clinic did favor the use of its facilities, employees, and partners when consistent with the medical needs of its patients.

In 1996, the Clinic sold its assets to Phycor, Inc. for more than $30 million.  Dr. Zarnow consented in writing to the sale, and he received $423,904.86 for his share.  Phycor was a management company and ran the day-to-day business side of the practice.  All matters involving the delivery of medical care remained within the discretion of medical doctors.  All nurses and administrative and management personnel, including Deanna Kyle, Linda Bruno, and Jim Resendez, were employees of Phycor.

Clinic members objected to Dr. Zarnow’s practice of referring patients to outside facilities because of the effect it had on Clinic revenues.  Dr. Zarnow’s referral practice was discussed in Phycor and Clinic executive committee meetings.  Several physicians on the Clinic’s executive committee personally encouraged Dr. Zarnow to use Clinic labs and diagnostic tools.  After a committee meeting in January 1997, two Clinic partners told him that the Clinic would reduce his salary if he continued sending lab work to outside facilities, and he was accused of not supporting the Clinic financially.  In 1999, an executive committee member told him that the Clinic was trying to get rid of him because of his complaints about the way things were run within the Clinic and his outside referrals.  Dr. Zarnow continued his use of outside laboratories and radiologists because he said he believed that practice to be in the best medical interest of his patients.

B.  The Criminal Investigation

Dr. Zarnow’s medical office was located in a large medical clinic building that contained many other physician offices and was visited by many patients.  According to the Clinic, it had in place for a long time a “no-firearms policy,” which prohibited the possession of any firearms on any Clinic premises and at any Clinic facility.  Dr. Zarnow, an avid gun collector, acknowledged that he was aware that the Clinic had a no-firearms policy and that there was a sign posted on the door to his medical building prohibiting firearms.

Dr. Zarnow generally kept his gun collection at his residence but on occasion he moved some munitions to his office, under lock and key, to secure them from potential flooding at his home.  Some firearms had been kept in his office desk for ten years, and Dr. Zarnow claimed several physician partners knew that he kept guns in his office.  At times Clinic personnel signed for deliveries of ammunition.

On July 1, 1999, Dr. Zarnow left town for a two-week vacation with his family.  He was scheduled to be gone until July 13, 1999.  When he returned, a baseboard on his office desk looked like it had been pried off, and an extra key to the desk that he had hidden in a prescription bottle was missing.  His nurse, Kyle, and the site manager, Bruno, were the only other persons with a key to his office.

A week before Dr. Zarnow was to return from vacation, Kyle and Bruno claimed that they found a gun in his desk, but they left the gun there.  Nurse Kyle told the Clinic CEO, Dr. Larry Lyford, about the find.  Dr. Lyford went to Dr. Zarnow’s office and said that he saw several guns, which he placed in a filing cabinet.  He told James Resendez, the executive director for the management company, that guns had been found in Dr. Zarnow’s office and that the executive committee needed to respond quickly.  Resendez asked Kyle if she was aware of anything else in Dr. Zarnow’s office.  She said she opened a drawer in his desk and discovered that it contained fuses.

The executive committee grappled with what to do about the find.  Resendez told the executive committee that he saw something related to munitions and that it was not good, though he did not know what it was.  He recommended that the committee immediately terminate Dr. Zarnow.  Some wanted to act immediately; others wanted to wait until Dr. Zarnow returned. They decided to contact their attorney, Gene Douglass, and to have the locks to Dr. Zarnow’s office changed.  Once the locks were changed, only Bruno and Resendez were allowed keys, but at no time was the building evacuated.

On July 13, 1999, Dr. Zarnow called his nurse to tell her his return would be delayed.  Resendez was present when she received the call, but neither one discussed or even mentioned the issue of the munitions to Dr. Zarnow.

The Clinic’s attorney, Douglass, ultimately contacted the Wichita Falls Fire Department and reported the discovery of firearms and “possibly explosive materials.”  Fire and police were dispatched to the Clinic to investigate.  Eventually, the search investigation involved the FBI, ATF, Customs, Fort Worth Bomb Disposal, and Fort Sill Army Explosive Ordnance Disposal personnel.  When the firemen arrived, no one appeared to be in distress, and Resendez directed them to Dr. Zarnow’s office.  Resendez informed the fire personnel, “There was some explosives.”  Fireman Nicholason, a former Army Ordnance man, told his chief that a detonation cord was found, “which is more powerful than a fuse and is an explosive device.”  Nicholson told police representatives that the items discovered were dangerous because the blasting caps were already crimped to what he thought was a detonator cord.  Fire Chief Lindsay stated in his deposition that it was reasonable, under the circumstances, for Resendez to want the items removed from the building.  The fire chief told Resendez that there was no immediate hazard or imminent emergency.  He advised Resendez that he could wait until the doctor returned to call the Emergency Ordnance Disposal Team from Fort Sill to remove the items. Resendez wanted the items out of the building and asked about evacuating the building.  The fire chief went ahead and called the Ordnance Disposal Team from Fort Sill.  He told Resendez that if it would make him feel better, he could clear the area.  At the time the area was occupied by one nurse—Kyle.  Kyle was told she could go home, but Bruno told her to stick around.  The fire chief was not sure how the situation escalated.

Based upon information that he received from police conducting a search of Dr. Zarnow’s desk, Police Officer Dilbeck was directed by his police superiors to prepare a search warrant for a locked filing cabinet in Dr. Zarnow’s office.  Dilbeck stated in his disposition that he believed that the criminal offense of possession of a prohibited weapon, explosive device, had been committed because of the discovery of the cannon fuse/detonation cord, but he never talked to anyone associated with the Clinic.  Dilbeck prepared the search warrant affidavit and presented it to a magistrate, and the search warrant for the filing cabinet was issued.  A firearm and a switchblade knife were discovered in the filing cabinet.

According to Dr. Zarnow, investigating police officers arrived at the Clinic, having been advised that explosive material was found in the office.  Kyle was taken to the police station to be interviewed and told an investigating officer that Dr. Zarnow was a loner, that he demanded that his office and exam rooms be locked at all times, that he had a rocket launcher, that he was very anti-President Clinton, that he was extremely opposed to the local hospital merger, that he said that it would be easy to bomb these facilities, that he detonates homemade bombs from an unknown location in Oklahoma, that he admitted having silencers for machine guns at his home, and that he is very moody, possibly manic depressive.

In his statement to police, Resendez said that he heard that Dr. Zarnow was a gun salesman and that he had just bought a truck big enough to carry a rocket launcher.  Bruno told officers that the executive committee told her to look around Dr. Zarnow’s office while the locks were being changed.  She said that during that search she found guns, a sawed-off shotgun, blasting caps, and a cannon fuse.  She told Resendez what she found and he then called the Clinic lawyer.

Based on the statements of Kyle, Bruno, and Resendez, along with the discovery of material in Dr. Zarnow’s desk, police officers prepared and obtained a search warrant for Dr. Zarnow’s residence because they believed that more explosives could be found there.  According to the search warrant, Dr. Zarnow could have been storing up explosives at his residence, his residence was booby-trapped, and his whereabouts were unknown.  The warrant stated that this information came from a female employee that worked with Dr. Zarnow.

A tactical team sent to watch Dr. Zarnow’s house discovered that he was at home and advised him that there was something going on at the Clinic.  Dr. Zarnow went to the Clinic to find out what was happening.  He was told that suspicious items were found in his office.  He voluntarily went to the police station to be interviewed.  Though Dr. Zarnow seemed puzzled and confused, he was cooperative.  He even advised the officials that he had more weapons at his house and other licensed firearms.  When Dr. Zarnow objected to an impromptu search by police officers, he was served with the search warrant for his premises.  All of Dr. Zarnow’s firearms and munitions were confiscated. A cache of numerous weapons of various kinds was found, as well as five containers of Thermite
(footnote: 2), threaded pipes and caps, 180–200 blasting caps, both fuse and electric types, five pounds of powdered aluminum, 200 pounds of nitrate, methane binary explosives, a detonating plunger, explosive booby traps, thirty blasting caps, a cannon fuse, and a projection device for grenades.  It was this last item that was believed to be a prohibited weapon.  

Officer Keethler’s superiors directed him to prepare an arrest warrant, and he did so.  He presented his affidavit to members of the Wichita County District Attorney’s Office, who reviewed the affidavit and advised that Dr. Zarnow was in violation of the penal code for possession of a prohibited weapon and directed that he obtain an arrest warrant from Judge Little.  Officer Keethler believed that the grenade launching device found in Dr. Zarnow’s home was a prohibited weapon; that he committed the offense of possession of a prohibited weapon; and that he should have been indicted.  Based upon the munitions finding and statements of Clinic employees, the arrest warrant was issued.  On July 14, 1999, Dr. Zarnow was arrested and charged with a prohibited weapon offense, a third degree felony.  He spent three days in jail; however the Wichita County Grand Jury declined to indict Dr. Zarnow for the alleged offense.

The police also attempted to charge Dr. Zarnow for illegal possession of bomb-making equipment.  Dr. Zarnow told the officers that he never said that he was going to blow up the hospital because of the merger.  At her deposition, Kyle denied making some of the statements that appeared in the search warrant and arrest warrant, including the statement that Dr. Zarnow made a bomb threat.  On July 20, 1999, a couple of officers returned to the Clinic to talk with staff about the bombing allegations, but officers were unable to substantiate the alleged threat.

In his deposition, Dr. Zarnow admitted that he had no basis to believe that anyone associated with the Clinic, as opposed to Phycor, told investigative officials that the items discovered at his Clinic office were explosives.  He testified that the police seized items from his office which the police believed to be explosives and that the Clinic had an obligation to protect workers and patients from hazards; that the Clinic Executive Committee and physicians had the right to decide that no guns or ammunition would be allowed on Clinic premises; that the Clinic had the right to have a no-firearms policy; that if there was such a policy, and if such items were discovered on Clinic premises, the Clinic would have the right to advise police and have the items removed; and that if anyone saw items on Clinic premises which they believed to be dangerous and failed to report this to police or fire personnel, that such conduct would be irresponsible.  The only person Dr. Zarnow knew to have told investigative personnel that he possessed a prohibited weapon was Phycor employee Resendez.

C. The Termination

On July 15, 1999, the Clinic told Dr. Zarnow that he was suspended as a partner pending further investigation.  Dr. Zarnow was also barred from entering the Clinic facility and told to remove his personal belongings.  On that day he was scheduled to see patients, but when patients showed up for their appointment, they were told that Dr. Zarnow was not available.  They were not told how to contact Dr. Zarnow or offered care from another physician. According to Dr. Zarnow, he was denied access to patient records and patients’ contact information, and the Clinic cancelled his participation with Medicare and BlueCross HMO as a medical services provider.  A few days after the arrest, Resendez held a news conference outside the Clinic and stated that Dr. Zarnow was no longer associated with the Clinic.

D. Dr. Zarnow’s Damages

Following these events, Dr. Zarnow began receiving psychiatric treatment from Dr. Harvey Martin.  Dr. Martin diagnosed acute situational reactive depression and prescribed medication for the depression and anxiety.  Dr. Zarnow had nightmares and difficulty sleeping.  As a result of the negative publicity accompanying the charge brought against him, Dr. Zarnow alleged that he suffered injury to his reputation as a citizen and medical doctor.  He alleged that agents of the Clinic and investigating officers provided false statements to the public in media interviews given in relation to his arrest, and these false statements misled the police into arresting him and subjected him to public ridicule.  His children were teased at school and were embarrassed to be seen with him in public, and he became alienated from each of his daughters.  For an extended period of time following Dr. Zarnow’s arrest, his wife was extremely upset and continually crying, and she had difficulty being with Dr. Zarnow on a personal level and withdrew from him.

E.  Dolores’s Causes of Action 

Dolores
(footnote: 3) sought to recover damages resulting from the breach of contract and tortious conduct by the Clinic.  First, Dolores’s first amended petition sought a declaratory judgment and alleged the following causes of action: malicious prosecution, intentional infliction of emotional distress, invasion of privacy, tortious interference, fraudulent inducement, and breach of contract.  Dolores claimed breach of contract based on events occurring while Dr. Zarnow was still working for the Clinic and when Dr. Zarnow was ousted.   

1. The Partnership Agreement Expulsion Provision 
  

Dr. Zarnow was a Clinic partner and he signed a partnership agreement. Section 10.02 of the partnership agreement provided that a partner may be expelled without cause by a two-thirds vote of the partners.  Dr. Zarnow acknowledged that the partnership had the absolute right to oust him from the partnership without cause and that he believed he was ousted from the partnership without cause.  Dr. Lyford testified that Dr. Zarnow was terminated at the July 1999 partnership meeting by a vote of more than two-thirds of the partners.  On July 27, 1999, the partnership exercised its rights to purchase Dr. Zarnow’s capital account, and he accepted the check.

2. Breach of Contract Claims

Dolores alleged that the Clinic breached its contract with Dr. Zarnow by illegally and wrongfully suspending him from practicing at the Clinic and by illegally ousting him from the practice of medicine.  Dolores further claims that the Clinic breached agreements with Dr. Zarnow long before he withdrew from any association with them by: (1) demanding that Dr. Zarnow refer all laboratory work inside the Clinic; (2) failing to provide Dr. Zarnow with a reasonable and necessary accounting for claimed expenses and/or changes; (3) failing to provide reasonable management services; (4) paying unreasonable amounts for administration costs, salaries, and expenses, resulting in inadequate compensation to the individual “physician-employees” of the Clinic; (5) failing to provide reasonable and necessary office, technical, and secretarial assistance, supplies, equipment, and such other facilities, services, and/or staff as was reasonably necessary for him to properly treat his patients with quality care; (6) failing to provide a sufficient number and quality of staff, including adequate training of such staff; (7) failing to provide reasonable and necessary support staff and services to the point that patient care could have been compromised; (8) failing to reasonably and adequately support Dr. Zarnow in delivering quality health care services to his patients; and (9) failing to provide reasonable financial management and control over costs, overhead, and expenses of operations of the Clinic.

According to the Clinic, there was no contract to be breached while Dr. Zarnow was still associated with the Clinic, and the partnership agreement contains no provision giving any partner the right of continuing association since section 10.02 allowed the expelling of a partner without cause.  The Clinic alleged that there was no evidence that the Clinic partners breached any contract with Dr. Zarnow by terminating him without cause. 

3. Tort Claims 

Dolores also raised claims against the Clinic for tortious conduct.  She alleged that the Clinic breached its fiduciary duty to Dr. Zarnow by failing to properly account for and pay him all salary due and that the Clinic tortiously interfered with patient relations.  She further alleged malicious prosecution, intentional infliction of emotional distress, and invasion of privacy all arising out of the Clinic’s conduct leading to his arrest and public humiliation.

F. The Clinic’s Motion for Summary Judgment

The Clinic moved for summary judgment on all claims Dolores asserted in this case on the ground that Dr. Zarnow’s sale of his partnership interest back to the partnership released the Clinic from any liability pursuant to section 10.03(c) of the partnership agreement.  The Clinic’s motions also separately addressed Dolores’s individual causes of action on various grounds.  Regarding the breach of contract claim for illegal and wrongful suspension and termination, the Clinic contended that Dr. Zarnow was properly suspended and discharged under sections 4.06(h), (k) and 4.08 of the partnership agreement. The Clinic also said the invasion of privacy claim is not recognized in Texas. The Clinic then moved for a no-evidence summary judgment on Dolores’s claims of intentional infliction of emotional distress.  The Clinic also listed as a subject of its summary judgment motion Dolores’s claim for tortious inference with patient relationships.
(footnote: 4)
 Dolores’s First Amended Original Petition was filed on November 19, 1999.  The Clinic’s Motion for Summary Judgment and No Evidence Motion for Summary Judgment were filed on November 30, 2001.  The Phycor defendants were dismissed on February 8, 2006 because of bankruptcy.  The trial court announced its decision to grant the Summary Judgment by letter of April 17, 2006, without specifying whether the traditional or no-evidence motion was being granted or the grounds therefor.  On August 1, 2006, Dolores filed her Second Amended Original Petition.  The final Summary Judgment was filed August 24, 2006.

III.
 
Standards of Review 

A. No-Evidence Motion for Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant’s claim or defense.  
Tex. R. Civ. P.
 166a(i).  The motion must specifically state the elements for which there is no evidence.  
Id.; Johnson v. Brewer & Pritchard, P.C., 
73 S.W.3d 193, 207 (Tex. 2002).  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.  
See
 
Tex. R. Civ. P.
 166a(i) & cmt.; 
Sw. Elec. Power Co. v. Grant, 
73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.  
Sudan v. Sudan,
  199 S.W.3d 291, 292 (Tex. 2006).  If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper.  
Moore v. K Mart Corp.
, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). 

B. Traditional Motion for Summary Judgment 

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  
IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason
,
 
143 S.W.3d 794, 798 (Tex. 2004); 
see
 
Tex. R. Civ. P.
 166a(b), (c).  When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.
  
IHS Cedars Treatment Ctr.
, 143 S.W.3d at 798. 

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.  
Rhone-Poulenc, Inc. v. Steel
, 997 S.W.2d 217, 223 (Tex. 1999).  To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law.  
Ryland Group, Inc. v. Hood,
 924 S.W.2d 120, 121 (Tex. 1996).

When a trial court’s order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious.  
Provident Life & Accident Ins. Co. v. Knott
, 128 S.W.3d 211, 216 (Tex. 2003); 
Star-Telegram, Inc. v. Doe
, 915 S.W.2d 471, 473 (Tex. 1995); 
Harwell v. State Farm Mutual Ins. Co.
, 896 S.W.2d 170, 173 (Tex. 1995).  When the trial court’s judgment rests upon more than one independent ground or defense, the aggrieved party must assign error to each ground, or the judgment will be affirmed on the ground to which no complaint is made.  
Scott v. Galusha
, 890 S.W.2d 945, 948 (Tex. App.—Fort Worth 1994, writ denied).

IV. Release

Dolores’s first two issues deal with section 10.03 of the partnership agreement and its applicability to her claims.  The Clinic moved for traditional summary judgment on all grounds asserted by Dolores based on the theory that the doctor released any claims he had against the Clinic when he sold his partnership interest back to the partnership.  Section 10.03(c) of the partnership agreement reads as follows:

The payment to the 
affected Partner 
or its representatives under this Section 10.03 is in complete liquidation and satisfaction of all the rights and interests of the affected Partner and its representative (and of all Persons claiming by, through, or under the affected Partner and its representative) in and in respect of the Partnership, including, without limitation, any Partnership interest, such Partner’s income interest, any rights in specific Partnership property, and any rights against the Partnership and (insofar as the affairs of the Partnership are concerned) against the Partners.  [Emphasis supplied.]

Section 10 defines “affected Partner” as a partner who (1) “voluntarily withdraws” or (2) “is expelled from the Partnership for cause” or (3) “remains a Partner after becoming a Bankrupt Partner.”  In its brief, the Clinic concedes that Dr. Zarnow was terminated from the partnership without cause by a vote of two-thirds of his partners.

The Clinic initially argues that Dr. Zarnow voluntarily withdrew from the partnership because the partnership agreement provides “no provision for the involuntary acquisition of a partner’s interest . . . when the partner is terminated without cause.  That being the case, so far as the release provisions of Section 10.03(c), Zarnow voluntarily withdrew from the ownership of partnership assets represented by his capital account.”  We reject this argument.  Dr. Zarnow was terminated involuntarily by a vote of at least two-thirds of the partnership partners.  He did not voluntarily withdraw.  Calling a duck a chicken does not make it a chicken.  It is still a duck.
(footnote: 5)  

Because Dr. Zarnow did not voluntarily withdraw from the partnership, but instead was terminated without cause, we hold that section 10.03 of the partnership agreement is inapplicable to him and therefore cannot operate to release the Clinic of Dolores’s potential claims.  Consequently, it was not an appropriate ground upon which the trial court could have granted summary judgment.

We shall now assess whether there were appropriate grounds on which the trial court could have based its summary judgment on the individual claims asserted by Dolores.  

V. No-Evidence Motion for Summary Judgment Analysis 

The Clinic filed its no-evidence motion for summary judgment and asserted that there was no evidence of Dolores’s claims of malicious prosecution and intentional infliction of emotional distress.
(footnote: 6)
 A. Malicious Prosecution 

In her sixth issue, Dolores claims that she presented sufficient evidence to create a genuine issue of material fact on each element for her malicious prosecution claim.  We disagree. 

To prevail on a claim for malicious prosecution, Dolores was required to prove that:  
(1) a criminal prosecution was commenced against Dr. Zarnow; (2) the Clinic initiated or procured that prosecution; (3) the prosecution terminated in Dr. Zarnow’s favor; (4) Dr. Zarnow was innocent of the charges;  (5) the Clinic lacked probable cause to initiate the prosecution; (6) the Clinic acted with malice; and (7) Dr. Zarnow suffered damages.  
See Richey v. Brookshire Grocery Co.
, 952 S.W.2d 515, 517 (Tex. 1997).

There was no evidence that 
the Clinic 
did anything to initiate or procure a prosecution against Dr. Zarnow.  All of the actors that were involved in this regard were Phycor employees, not Clinic employees.  Furthermore, the supreme court has expressly stated that “[a] person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false.”  
Browning-Ferris Indus., Inc. v. Lieck
, 881 S.W.2d 288, 292 (Tex. 1994).  Here it was not shown that the Clinic provided information known to be false, and the decision of whether to prosecute Dr. Zarnow was left to the discretion of law enforcement and ultimately the grand jury. 

After 
examining the entire record in the light most favorable to Dolores and indulging every reasonable inference and resolving any doubts against the motion,
 we hold that Dolores failed to bring forward more than a scintilla of probative evidence that raises a genuine issue of material fact.  
See
  
Sudan,
 199 S.W.3d at 292;
 Moore
, 981 S.W.2d at 269.  Thus, the granting of the no evidence summary judgment on this claim was proper.  We overrule Dolores’s sixth issue.  

B. Intentional Infliction of Emotional Distress 
 

In her seventh issue, Dolores claims that she presented sufficient evidence to create a genuine issue of material fact on each element of her intentional infliction of emotional distress claim.  We disagree. 

The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant’s actions caused the plaintiff emotional distress; and (4) the emotional distress that the plaintiff suffered was severe.  
City of Midland v. O'Bryant
, 18 S.W.3d 209, 216 (Tex. 2000).  To be considered extreme and outrageous, conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and as to be regarded as atrocious and utterly intolerable in a civilized community.  
Id.
 at 217. 

Under this cause of action Dolores claims that alleged damages flow from the ordeal that accompanied the police investigation involving Dr. Zarnow. However, we agree with the Clinic that Dolores presented no evidence that the Clinic acted intentionally or recklessly with regard to this incident.  The Clinic simply asked law enforcement to investigate what it believed to be a legitimate safety issue concerning possible explosives and firearms present in Dr. Zarnow’s office.  

Dolores contends that “the Clinic was determined to remove Dr. Zarnow from the partnership for his refusal to practice medicine in a way that would bolster the financial condition of the Clinic, regardless of the best interests of his patients.”  However, as discussed above, under the partnership agreement, the Clinic was allowed to involuntarily terminate Dr. Zarnow from the partnership with a two-thirds vote of the partners.  “[A] claim for intentional infliction of emotional distress does not lie for ordinary employment disputes.”  
GTE Sw., Inc. v. Bruce
, 998 S.W.2d 605, 612–13 (Tex. 1999).  The mere fact of termination of employment, even if the termination is wrongful, is not legally sufficient evidence that the employer’s conduct was extreme and outrageous.  
Sw. Bell Mobile Sys., Inc. v. Franco
, 971 S.W.2d 52, 54 (Tex. 1998).
  Under these facts, we cannot say that the Clinic’s conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and as to be regarded as atrocious and utterly intolerable in a civilized community.  
 Midland
, 18 S.W.3d
 at 217.

Because there was no evidence that the Clinic acted intentionally or recklessly or that its conduct was extreme and outrageous, we overrule Dolores’s seventh issue.   

VI. Traditional Motion for Summary Judgment Analysis 

In its traditional motion for summary judgment, the Clinic asserted as grounds the affirmative defense of release (which we previously rejected), that the claim of invasion of privacy as asserted by Zarnow is not a recognized claim in the State of Texas, and that the claim of illegal and wrongful suspension and termination was barred because the Clinic was acting under its rights under the partnership agreement.

A. 
Invasion of Privacy 

In her fourth issue, Dolores claims that the trial court erred by granting summary judgment in favor of the Clinic on her invasion of privacy claim.  The Clinic responds that Phycor employees, not Clinic Employees, were the ones that entered Dr. Zarnow’s office and discovered firearms.  Moreover, the Clinic contends that the claim as pled is not a recognized cause of action in Texas.  Specifically, the Clinic alleges that Dolores’s invasion of privacy claim is a claim for false light invasion of privacy.  

The Texas Supreme Court has described false light invasion of privacy as follows: 

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Diamond Shamrock Ref. & Mktg. Co. v. Mendez
, 844 S.W.2d 198, 200 (Tex. 1992) (analyzing the proof of a false light invasion of privacy even though the court had not recognized such a tort).  However, Texas does not recognize a cause of action for false light invasion of privacy.  
Cain v. Hearst Corp.
, 878 S.W.2d 577, 578 (Tex. 1994).  

On the other hand, Dolores claims her cause of action is for invasion of privacy by intrusion into seclusion.  The three elements that must be established to sustain this cause of action are:  (1) an intentional intrusion;  (2) upon the seclusion, solitude, or private affairs of another;  (3) which would be highly offensive to a reasonable person.  
Doe v. Mobile Video Tapes, Inc.
, 43 S.W.3d 40, 48 (Tex. App.—Corpus Christi 2001, no pet.).   The core of this claim is the offense of prying into the private domain of another, not publication of the results of such prying.  
Clayton v. Richards
, 47 S.W.3d 149, 153 (Tex. App.—Texarkana 2001, pet. denied).

In other words, the actual entering of Dr. Zarnow’s office and desk is what has to be highly offensive to a reasonable person, not the publicity resulting from the exposure of what was found there.  For this reason, even assuming that Dolores’s claim was for invasion of privacy by intrusion into seclusion, and that it was Clinic employees that were the actors, we still hold that the trial court properly granted summary judgment on this claim.  The core of Dolores’s claim here deals not with the offensiveness of the entering of Dr. Zarnow’s office and desk, but instead with the ordeal that resulted from the exposure of what was discovered in his office and desk.  Further, Dr. Zarnow was not present in his office, or even the Clinic, when the intrusion occurred. 

Dr. Zarnow knew there was a no-firearms policy in place, and it was entirely reasonable for the Clinic to seek removal of firearms and possible explosives from its premises.  Under these facts, we cannot say that the intrusion into Dr. Zarnow’s office and desk would be highly offensive to a reasonable person.  Because the Clinic
 conclusively negated at least this one essential element of Dolores’s  cause of action, we hold that it was entitled to summary judgment on that claim.  
IHS Cedars Treatment Ctr.
,
 
143 S.W.3d at 798
.  Accordingly, we overrule Dolores’s fourth issue.    

B. Breach of Contract Claim—Suspension and Termination  

In her fifth issue, Dolores claims the Clinic breached its contract with Dr. Zarnow by wrongfully suspending and terminating him from the partnership.  Under section 10.02 of the partnership agreement, the Clinic had the absolute right to expel Dr. Zarnow without cause by a vote of two-thirds of the partners. Again, we note that Dr. Zarnow was a Clinic partner and that he signed the partnership agreement.  We fail to see how Dolores would have any cause of action against the Clinic for its simply exercising its rights under the agreement Dr. Zarnow signed.  Accordingly, we hold that summary judgment was properly granted on this claim and overrule Dolores’s fifth issue. 

VII. Final Summary Judgment 

Dolores contends in her third issue that the trial court erred by rendering a final summary judgment because the Clinic did not prove its defense of release as a matter of law.  As previously discussed, although the release defense addressed all of Dolores’s claims, it did not warrant the granting of summary judgment.  However, the Clinic’s motion also addressed Dolores’s individual claims on other grounds with one exception.  

A. Pretermination Breach of Contract and Fraudulent Inducement Claims 

Dolores argued below that the Clinic breached its contract in various ways while Dr. Zarnow was still employed by the Clinic.  Now, she asserts that the Clinic’s motion for summary judgment does not address these claims and thus the trial court could not have rendered final summary judgment.

First, Phycor, not the Clinic, was the management company that ran the day-to-day business side of the practice. Second, there was no contract to which Dr. Zarnow was a party that could have been breached while he was still associated with the Clinic.  Nowhere in her first amended petition does Dolores’s state exactly what contract was allegedly breached.  A close reading of Dolores’s claims here, many of which relate to the day-to-day business aspects of the practice, reveals that they could only implicate the contract and service agreement that were executed by the Clinic and Phycor when the Clinic was sold.  Dolores also claimed that the Clinic was fraudulently induced into these agreements by Phycor.    

Privity in contract provides a party with standing to maintain an action.  
See, e.g., Interstate Contracting Corp. v. City of Dallas
, 135 S.W.3d 605, 618 (Tex. 2004) (citing 
Brown v. Todd
, 53 S.W.3d 297, 305 (Tex. 2001) (under Texas law, standing limits subject matter jurisdiction to cases involving a distinct injury to the plaintiff and a real controversy between the parties, which will be actually determined by the judicial declaration sought)).  Privity is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff.  
See Conquest Drilling Fluids v. Tri-Flo Int’l
, 137 S.W.3d 299, 308 (Tex. App.—Beaumont 2004, no pet.).  Here Dr. Zarnow was not a party to the contract or agreements that Dolores now claims were entered into due to fraudulent inducement and subsequently breached.  She therefore lacks privity of contract and consequently lacks standing to assert these claims.    

Standing, as a component of subject matter jurisdiction, cannot be waived and may be raised for the first time on appeal by the parties or by the court.  
Tex. Ass’n of Bus. v. Tex. Air Control Bd.
, 852 S.W.2d 440, 445–46 (Tex. 1993).  Because Dr. Zarnow, and Dolores as administrator of his estate, did not have standing to assert these claims, we dismiss these portions of Dolores’s third issue.     

B. Tortious Interference 

In her petition, Dolores asserted a claim for tortious interference with business relations.  
Specifically, Dolores claimed that the Clinic “tortiously and maliciously interfered with the doctor/patient relationship Dr. Zarnow ha[d] established with countless patients in the North Texas area.”  Although the Clinic listed Dolores’s tortious interference claim in its motion for summary judgment, it did not address the claim or show why summary judgment should be granted on that claim.  

If a defendant moves for summary judgment on only some of the claims asserted by the plaintiff, but the trial court renders judgment that the plaintiff take nothing on all claims asserted, the judgment is final—erroneous, but final.  
Jacobs v. Satterwhite
, 65 S.W.3d 653, 655 (Tex. 2001).  Because the tortious interference claim was not addressed in the Clinic’s motion, summary judgment on that claim was erroneous.  
Id.
;
 see also Black v. Victoria Lloyds Ins. Co.
, 797 S.W.2d 20, 27 (Tex. 1990) (“A summary judgment movant may not be granted judgment as a matter of law on a cause of action not addressed in a summary judgment proceeding.”).  Therefore, we sustain the portion of Dolores’s third issue that relates to her tortious interference claim and reverse and remand on that claim. 

VIII. Conclusion

Having sustained a portion of Dolores’s third issue and overruled each of her remaining issues, we affirm in part and reverse and remand in part to the trial court for consideration of the tortious interference claim.     
  

BOB MCCOY

JUSTICE

PANEL B: LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED:
 August 31, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Thermite is a chemical mixture that can be used as a component of an incendiary device.  

3:
After Dr. Zarnow filed his original petition and after the Clinic filed its motion for summary judgment Dr. Zarnow died on January 28, 2006.  Dolores chose to continue pursuing his claims as the administrator of Dr. Zarnow’s estate.  Accordingly, we will refer to “Dolores’s claims.”  

4:
The Clinic also moved for summary judgment on claims that were later dismissed.

5:
See Tidelands Marine Serv. v. Patterson
, 719 F.2d 126, 128 n.3 (5th
 Cir. 1983). 

6:
In her first amended original petition Dolores also asserted a breach of fiduciary duty claim based upon salary complaints.  The Clinic also moved for no evidence summary judgment on this claim.  However, it appears that Dolores has abandoned this cause of action on appeal.